CROKER et al. v. CROKER et al.
No. 5942.

Circuit Court of Appeals, Fifth Circuit.
June 30, 1931.

See also 9 F.(2d) 409.

J. T. G. Crawford and George C. Bedell, both of Jacksonville, Fla., and Frederick R. Ryan, of New York City, for appellants.

George M. Powell, of Jacksonville, Fla., F. T. Fancher, B. F. Paty, C. H. Warwick, Jr., and R. E. Robinson, all of West Palm Beach, Fla., F. P. Fleming and C. H. Lichliter, both of Jacksonville, Fla., and C. D. Blackwell, of West Palm Beach, Fla., for appellees.

Before FOSTER, SIBLEY, and HUTCHESON, Circuit Judges.

HUTCHESON, Circuit Judge.

Appellants, children of Richard Croker, deceased, by this appeal bring into question the correctness of a decree of the court below denying their claim as heirs under the homestead sections of the Florida Constitution, to property described by them in their brief, as about "one mile of valuable ocean front now in the town of Palm Beach, Florida, owned by the late Richard Croker at the time of his death."

There are three appellees: (1) Bula Croker, widow of Richard Croker, Sr., who claims all of the property, claiming to have acquired it in one of three ways, by deed in Croker's lifetime, by prescription under the deed, or by his will; and (2) J. B. McDonald and Palm Beach Estates, together claiming part of the property by purchase from Bula and Richard Croker in his lifetime.

The District Judge found generally against the appellants on the issue of homestead and dismissed their bill. He did not find it necessary, nor do we, since we agree with his conclusion on the homestead issue, to determine whether Bula Croker acquired her title by deed, by prescription, or by will; or the correctness of the claim made by McDonald and the Palm Beach Estates that they acquired title to part of the property by deeds from Croker and wife. See Croker v. Croker (D. C.) 7 F.(2d) 218, 219; Bula Croker v. Palm Beach Estates, 94 Fla. 171, 114 So. 225. .

We have been greatly aided by the excellent briefs which have exhaustively collected and collated the significant features of the evidence and the applicable authorities. While these briefs have made it clear that the matter must be disposed of ultimately as a question of fact, they have also made it plain that there are certain legal principles which must be kept in mind in apprehending, relating, construing, and giving significance to the primary facts which the voluminous record discloses. A brief statement of these principles will serve, we think, to explain and support the conclusion that the land in question was not "a homestead * * * owned by the head of a family residing in this State," and that therefore there was no homestead exemption inuring to the appellants as heirs of Richard Croker.

Primarily it must be borne in mind that while the courts of Florida have construed most liberally the inurement provision of article 10, § 2, of the Florida Constitution in favor of the heirs of a homestead owner, resident in the state, whether these heirs are themselves adult or infant, resident or non-residents on the homestead or in the state (Norton v. Baya, 88 Fla. 1, 102 So. 361), the Florida courts, in line with the uniform current of American authorities upon homestead exemptions, are very firm in maintaining, "The Constitution does not contemplate that the exemptions allowed shall extend to any title, right, or interest in property that is not owned by the head of a family residing in this state." Pasco v. Harley, 73 Fla. 819, 75 So. 30, 33; Lanier v. Lanier, 95 Fla. 522, 116 So. 867.

It is also clearly settled by the Florida decisions that while "the provisions of the homestead laws should be carried out in the liberal and beneficient spirit in which they were enacted, but at the same time great care should be taken to prevent them from becoming the instruments of fraud," Jetton Lbr. Co. v. Hall, 67 Fla. 61, 64 So. 440, 51 L. R. A. (N. S.) 1121, those decisions strictly declare that, "The 'exemptions' allowed do not attach to real estate that is not occupied as the home of the family." The place must be not a theoretical, but a real place of residence. Solary v. Hewlett, 18 Fla. 756; Matthews v. Jeacle, 61 Fla. 686, 55 So. 865; Pasco v. Harley, 73 Fla. 819, 75 So. 30, 32.

Under the Florida decisions, actual occupancy of a home with intention to remain there and make it the home of the family, the place of their actual use and occupancy, is essential to the homestead right. Loring v. Wittich, 16 Fla. 498; Oliver v. Snowden, 18 Fla. 823, 43 Am. Rep. 338; Drucker v. Rosenstein, 19 Fla. 191. Further, the right to the exemption may be lost after it accrues by the owner ceasing to be the "head of a family residing in this state," Matthews v. Jeacle, 61 Fla. 686, 55 So. 865, 867; Herrin v. Brown, 44 Fla. 782, 33 So. 522, 103 Am. St. Rep. 182; or by the abandonment of the property as the home of the family, Murphy v. Farquhar, 39 Fla. 350, 22 So. 681; Pasco v. Harley, 73 Fla. 819, 75 So. 30, 33.

In these respects the decisions of Florida but emphasize and confirm that public policy which underlies this institution of purely American origin, that it is designed to secure and does secure to residents of the state the secure protection of a family home; or as stated in Stanton v. Hitchcock, 64 Mich. 316, 31 N. W. 395, 8 Am. St. Rep. 821, quoted with approval in Tromsdahl v. Nass, 27 N. D. 441, 146 N. W. 719, 721, 52 L. R. A. (N. S.) 746: "The state's guaranty of the right of homestead was designed to protect those who had subjected themselves to its laws, and acted in reliance on them, but not to treat as homes what are not homes, or give powers to non-residents which could not, under any circumstances, be of use to them personally."

It is also true that in Florida, as elsewhere, one may be the head of a family residing in the state without being a citizen thereof, and one may be a citizen of a state without being the head of a family residing there. State v. Adams, 45 Iowa, 99, 24 Am. Rep. 760; Hauenstein v. Lynham, 100 U. S. 483, 25 L. Ed. 628; Minor Conflicts of Law, § 21, p. 60; State v. Jackson, 79 Vt. 504, 65 A. 657, 8 L. R. A. (N. S.) 1245, citizenship not being an essential to but one of the factors in determining the question of permanent residence vel non within the state. If permanent residence in the state is coupled with the own-

ership of property which is adapted to be and is used as a family home, the exemption secured by the Constitution exists in favor of the home owner, whether under nice distinctions "the place where he lives be called his domiciliary residence or merely his residence."

For it is not the nice distinctions inherent in legal words, but the fact of actual use and occupancy of the home with the intention of permanency, which gives the exemption. Chitty v. Chitty, 118 N. C. 647, 24 S. E. 517, 32 L. R. A. 394; Smith v. Croom, 7 Fla. 81.

In this view while we do attach great evidentiary significance to the facts regarding Glencairn, the Irish estate of Croker, we think these facts should be considered as part of the full stream and not as having the great particular legal significance that appellees would, on the theory of the law of domicile of origin, attach to them. We do think, however, that taken as a part of the deepening stream of his life they show and form the current of it, and irresistibly carry the mind to the conclusion that if Glencairn in Ireland was not his home, he had no home.

The briefs of the parties cite many authorities. Both rely upon Jacobs on Domicile, while for the appellees emphasis is placed upon Marks v. Marks (C. C.) 75 F. 321; Munro v. Munro, 7 C. & F. 891; Udny v. Udny, 1 H. L. 441; 9 Eng. Ruling Cases, 782; Moorehouse v. Moorehouse, 10 H. L. Cases (Eng.) 272; Somerville v. Somerville, 5 Ves. 750, also reported in First Am. Ruling Cases 284 to 302. Other American cases relied on by appellees are McKowen v. McGuire, 15 La. Ann. 637; Smith v. Croom, 7 Fla. 81; Pickering v. Winch, 48 Or. 500, 87 P. 763, 9 L. R. A. (N. S.) 1159; Mitchell v. U. S., 21 Wall. 350, 22 L. Ed. 584.

Appellants on their part cite Ennis v. Smith, 14 How. 400, 14 L. Ed. 472; Desmare v. U. S., 93 U. S. 605, 23 L. Ed. 959; Mitchell v. U. S., 21 Wall. 350, 22 L. Ed. 584; Gilman v. Gilman, 52 Me. 165, 83 Am. Dec. 502; Duke v. Duke, 70 N. J. Eq. 135, 62 A. 466; Maxwell v. McClure, 22 H. L. 7; Chitty v. Chitty, 118 N. C. 647, 24 S. E. 517, 32 L. R. A. 394; Smith v. Croom, 7 Fla. 81.

It will not serve any purpose to discuss or analyze these cases. All of them are really fact cases wherein conclusions are reached upon the controlling facts therein, and the same judge would, upon their varying facts, have decided all of them in principle in the same way.

Coming to a consideration of this case on the facts, we think it must be said that the difficulty in this, as in all other cases involving the question of domicile or residence, arises out of the fact that the controversy springs in a collateral way; that is, it exists where persons are seeking to apply to border line cases a term which, designed for plain cases, has to have its limitations pricked out in case by case. In the plain cases if litigation ever does arise in them, no stretching or pulling of the term is needed. No presumptions need be resorted to, no difficulties arise. In the border line cases, that is, where the acts and/or the statements relied on to prove the fact of residence are in themselves equivocal, subject to being resolved either way, or where the result of a series of acts and statements is equivocal because, though the individual acts and statements themselves may each in itself be unequivocal and of plain meaning, the aggregate of them presents a confused and contradictory mass, equivocal as a whole. Then in order to properly determine the question which must in the end control, of what in fact was the place of residence, it becomes necessary to marshal all of these equivocal and contradictory acts and statements and the equivocal situations which they produce in an effort to discover some current which runs through and gives final character to them all.

To the claim that Croker had repatriated himself, which appellees sought to establish by proof of his long residence in Ireland, the establishment of his great estate there, the expression of his intention and desire to become a citizen of the Irish Free State, contained in the document so bitterly contested as spurious, appellants oppose the great facts establishing Croker's continued American citizenship, his early naturalization here as an American citizen, his long, intimate, and powerful connection with American life, business and political, the fact that his fortune was made here and that his investments, outside of his stables, were always here maintained.

While we think appellants have greatly the best of it on this issue of citizenship, we also think it plain that the point has only small bearing upon the real issue here, which is not citizenship, but residence in Florida as the owner and occupier of a home. Whether or not Croker was a citizen of the United States and the state of Florida, or of the Irish Free State or of Great Britain, we think is per se wholly immaterial. Whether he was a homestead owner residing in the state of Florida is the question.

When the record upon that question is examined in the light of the tremendously important fact that all of the plaintiffs, the children of Croker, have in the bitterly contested litigations in which they involved their father in his later years declared in their pleadings and under oath time and time again that he was a resident not of Florida, but of Ireland, and in the case at bar none of them have taken the stand to retract or explain away the sworn statements which they made, we think the conclusion easy that they were right there and wrong here. Men often find themselves hoist on their own petards when, having one objective in mind, they take a course to reach it which runs counter to another course they might have taken, and which it turns out later would have been a more effective one. Having done this, the end still unattained, they find themselves either because of a real estoppel unable to retrace their way, or no real estoppel present, evidentially embarrassed by the solemn affirmation once of that which they would now deny.

Nor is there anything inequitable in the flowing of such a result from such a situation. Not that the acts, the pleadings, and the affidavits of the plaintiffs in those cases may be taken now against them as real estoppels to assert against his widow, he being dead, the contrary of what they asserted against him living, but that just as family history constitutes one of the great exceptions to hearsay, and things are taken to be as families represent them among themselves to be, it must be as a fact considered prima facie true that Richard Croker did live in Ireland when every one of his children, with whom until his second marriage he was friendly and for whom he had made generous provision, and all of whom had lived for a time with him at his family home in Ireland, have stated, both sworn and unsworn, that he did live there. When they now come in to assert the contrary, but do not themselves take the stand to testify to a single fact which would explain or rebut their former statements made deliberately and under oath, it should, we think, stand as proven, unless the contrary is by clear and convincing evidence established, that the facts are as to their father's residence, what they have so persistently at other times said they were.

Apart from this, we think the whole record, viewed not piecemeal but in bulk, shows that Ireland was his home. It is true there are many facts in this record which have individual significance to the contrary. Things done and said by Croker, an old man, with an old man's vagaries, his inconsistencies, his instabilities, which giving momentary glimpses of his mind, tend to point to an intention there the contrary of what we find. These are but flecks of light, flickering through a lowered shade which distort and magnify the things they show. The real truth lies within, and since we cannot enter there, it must be sought in those facts disclosed by the record, which give a larger view of the whole content of his life.

One of these facts is the place Glencairn. It stands like a lighthouse, illuming this whole record. There his pride and affection centered. There had he built himself on an estate of seven hundred acres, a great house of Irish granite for the purpose as he declared, of establishing a home for the Croker family for all time. In the study there at his direction had been carved above the mantel, "East or West, home is best." It was to this place that he returned from America after his fierce struggle there to maintain against his children, the affirmative of that imperious query, "Is it not lawful for me to do what I will with mine own?" It was to this place, the litigations over, the property placed in McDonald's hands for disposition, he returned for the rest and peace that home alone can give. It was here he drew his last breath; it was here, when he died, that they buried him. Here is the mausoleum built under his own directions for his last resting place, and, "Here he lies, where he longed to be; home, the sailor, home from the sea; the hunter home from the hill."

We think the District Judge was right in denying plaintiffs' claim of homestead. The evidence in our opinion does not establish that Richard Croker ever had a home in Florida. It certainly establishes that if it was ever there it was only his temporary one, and was permanently abandoned for his Irish home some time before his death.

The judgment of the court below is affirmed.